IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Action No. 06-cv-02605-LTB

PITKIN IRON CORPORATION, a Colorado corporation,

   Plaintiff,

v.

DIRK KEMPTHORNE, in his official capacity as Secretary of the United States Department of the Interior,
BUREAU OF LAND MANAGEMENT, an agency of the United States Department of the Interior, and
INTERIOR BOARD OF LAND APPEALS,

   Defendants.

---

**MEMORANDUM OPINION AND ORDER**

---

Babcock, J.,

  Plaintiff, Pitkin Iron Corporation ("Pitkin"), seeks reversal of the Interior Board of Land Appeals ("IBLA") decision in this matter dated November 29, 2006, and affirmance of Chief Administrative Law Judge ("ALJ") Holmes's decision dated May 3, 2004. The ALJ's decision held the Government had not made a *prima facie* case that limestone on two placer claims—Chemin 5 and Chemin 6—was a common variety that was not locatable under the Common Varieties Act. The IBLA decision reversed the ALJ decision and further held that the limestone located on the Chemin 5 and Chemin 6 placer claims was a common variety. Jurisdiction is proper under 28 U.S.C. § 1331. Oral argument would not materially assist the determination of this appeal. After consideration of the papers and the administrative record,

1

and for the reasons stated below, I VACATE the IBLA decision and REMAND to the Office of Hearings and Appeals with instructions to REINSTATE the May 3, 2004, ALJ decision in this case.

## I.  BACKGROUND

This appeal is the most recent in a long series of disputes involving two mineral claims approximately two miles north of Glenwood Springs, Colorado.  *See Mid-Continent Res., Inc. Pitkin Iron Corp.*, 148 IBLA 370 (1999), for additional background.  From at least 1956 through 1992, two limestone quarries—the Mid-Continent Quarry and Marblehead Quarry—operated on BLM-administered land near the Chemin 5 and Chemin 6 claims.  Pitkin began mining the Mid-Continent Quarry in 1982 pursuant to an agreement with Mid-Continent Resources, Inc. Limestone produced from the Mid-Continent Quarry tapped into a large and widespread limestone formation referred to as "Leadville Limestone."  Limestone from the Mid-Continent Quarry typically had a calcium carbonate—an alkali compound that has numerous chemical and industrial applications—content that exceeded 95%.  Limestone from the Marblehead Quarry averaged a much lower calcium carbonate content.

The Chemin 5 and Chemin 6 claims comprise two piles of crushed limestone extracted from the Mid-Continent Quarry during mining operations in the 1980s and 1990s.  Pitkin located—*i.e.*, claimed an exclusive right to extract the limestone from—the Chemin 5 and Chemin 6 claims in 2001.  The Government contested the validity of the claims under the Common Varieties Act, 30 U.S.C. § 601 *et seq.*, which removed deposits of "common varieties" of minerals—such as building stone and gravel—from location under the General Mining Law of 1872, 30 U.S.C. § 22 *et seq*.

A hearing on the issue was held before Chief Administrative Law Judge John C. Holmes on October 28 and 29, 2003. The ALJ concluded the Government failed to meet its burden of presenting a *prima facie* case that the Chemin 5 and Chemin 6 claims were not uncommon variety limestone. (Administrative Record "Rec." 1501). In particular, the ALJ found the Government mineral examiner who opined that the limestone was a common variety did not base his opinion on the appropriate legal standards because: (1) the mineral examiner opined that only limestone with a carbonate content above 95% was locatable; (2) the mineral examiner improperly compared the Chemin 5 and Chemin 6 limestone to similar uncommon variety limestone rather than limestone generally; and (3) the mineral examiner failed to consider the chemical use of the Chemin 5 and Chemin 6 limestone as an acid neutralizer for mining reclamation purposes to be an uncommon variety use.

On November 29, 2006, the IBLA reversed the ALJ decision. *See United States v. Pitkin Iron Corp.*, 170 IBLA 352 (2006). The IBLA initially found that the Government had established a *prima facie* case and then—after reviewing the record *de novo*—concluded Pitkin had not presented sufficient evidence to prove by a preponderance of the evidence that the Chemin 5 and Chemin 6 limestone had a special or unique quality rendering it uncommon. This appeal followed.

## II.  STANDARD OF REVIEW

Under the Administrative Procedures Act ("APA"), I defer to the decisions of the IBLA and will set aside an IBLA decision only if it is arbitrary, capricious, otherwise not in accordance with law, or not supported by substantial evidence. *See IMC Kalium Carlsbad, Inc. v. Interior Bd. of Land Appeals*, 206 F.3d 1003, 1009 (10th Cir. 2000). I may examine both the IBLA and

the ALJ's decisions, but—because the IBLA is the final decisionmaker of the Department of the Interior—I apply the deferential standard of review only to the IBLA decision. *Id*. The standard of review does not change merely because—as here—the ALJ and the IBLA each reached different conclusions. *Id*.

Review under the "arbitrary and capricious" standard is narrow. *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974). I am not empowered to substitute my judgment for that of the IBLA. *See Foust v. Lujan*, 942 F.2d 712, 714 (10th Cir. 1991). Instead, my review is limited to an examination of whether the IBLA acted within the scope of its authority, whether the IBLA decision was based on a consideration of the relevant factors and applicable legal standards, whether the IBLA made a clear error of judgment, and whether the IBLA followed the necessary procedural requirements. *See Webb v. Hodel*, 878 F.2d 1252, 1255 (10th Cir. 1989). If the IBLA "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," the IBLA's ruling is arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983).

Under the "substantial evidence" test, I must affirm the IBLA's decision if it is based upon "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Foust*, *supra*, 942 F.2d at 714 (citing *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). For evidence to be "substantial" it must be something more that a mere scintilla, but may be less that the weight of the evidence. *Id*. (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The "substantial evidence" test imposes an affirmative duty on this Court to review

4

the record to ensure the agency's action is supported by specific facts. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1576 (10th Cir. 1994). Because the substantiality of the evidence must be based upon review of the record as a whole, I am not free to disregard contrary evidence in the record. *See Bowman Transp.*, *supra*, 419 U.S. at 284 n.2; *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III. LOCATABLE CLAIMS UNDER THE COMMON VARIETIES ACT

This case turns on whether the limestone on the Chemin 5 and Chemin 6 claims qualifies as "uncommon variety" limestone. The Mining Law of 1872, 30 U.S.C. § 21 *et seq.*, authorizes free entry on public lands for the purpose of establishing claims to valuable mineral deposits. Under the Common Varieties Act, 30 U.S.C. § 601 *et seq.*, however, this right does not extend to those varieties of minerals that are considered "common varieties." If a mineral is a "common variety," it may be sold by the BLM without the attendant right to exclusive possession that accompanies locatable minerals under the Mining Law of 1872.

"Common varieties" include—among other things—deposits of building stone and gravel such as the limestone gravel piles at issue in this case. 30 U.S.C. § 611. "Common varieties" do not, however, "include deposits of such materials which are valuable because the deposit has some property giving it distinct and special value." *Id*. Thus, an otherwise "common variety" of material possessing some property giving it distinct and special value can be located under the Mining Law of 1872 as an "uncommon variety."

Before a reviewing court reaches a consideration of whether an otherwise "common" stone is "uncommon" because it has a distinct and special value, the Government bears the burden of establishing *prima facie* the invalidity of the claims. *United States v. Zweifel*, 508

5

F.2d 1150, 1157 (10th Cir. 1975). In order to make its *prima facie* case, the Government is required to present substantial evidence showing: (1) the mineral material in question is sand, stone, gravel, pumice, pumicite, or cinders; (2) the material's price is similar to that paid for such material typically put to "common variety" use; and (3) the Government's witnesses have been unable to identify any special use for the mineral material that would justify commanding a price higher than the price paid for the "common variety." *See*, *e.g.*, *United States v. Stacey*, 171 IBLA 170, 174–75 (2007); *United States v. Knipe*, 170 IBLA 161, 165 (2006); *United States v. Multiple Use, Inc.*, 120 IBLA 63, 65 (1991).

Once the Government makes out its *prima facie* case, the burden then shifts to the claimant to show the claim includes a valid "uncommon variety" mineral. *Zweifel*, *supra*, 508 F.2d at 1157. At the time of the hearing in this matter, the regulation controlling whether a variety was "common" or "uncommon" was found at 43 C.F.R. § 3711.1(b). The regulation stated that "common varieties" were those that did "not possess a distinct, special economic value for such use over and above the normal uses of the general run of such deposits." *Id*. An otherwise "common" variety would be considered "uncommon" under this standard "if a particular deposit ha[d] distinct and special properties making it commercially valuable for use in a manufacturing, industrial, or processing operation." *Id*. When determining "commercial value," relevant factors included the "quality and quantity of the deposit." *Id*. Limestone that was "of chemical or metallurgical grade, or that [was] suitable for making cement" was *per se* a locatable "uncommon variety." *Id*. Case law subsequently established that limestone possessing a total carbonate content of 95% or more constituted "chemical or metallurgical grade" limestone that was *per se* locatable. *See United States v. Chas. Pfizer & Co., Inc.*, 76 Interior

6

Dec. 331, 342 (1969).

In 1969, the Ninth Circuit expressed a five-part test—the now-ubiquitous *McClarty* test—to establish whether a "common variety" mineral that is not *per se* locatable nonetheless qualifies as an "uncommon variety" due to the mineral possessing a special or unique quality:

> (1) there must be a comparison of the mineral deposit in question with other deposits of such minerals generally; (2) the mineral deposit in question must have a unique property; (3) the unique property must give the deposit a distinct and special value; (4) if the special value is for uses to which ordinary varieties of the mineral are put, the deposit must have some distinct and special value for such use; and (5) the distinct and special value must be reflected by the higher price which the material commands in the market place.

*McClarty v. Sec'y of Interior*, 408 F.2d 907, 908 (9th Cir. 1969). The Department of the Interior subsequently adopted these factors—as well as the prior regulation regarding chemical, metallurgical, or cement-grade limestone—into its own regulations. *See* 43 C.F.R. § 3830.12.

## IV. DISCUSSION

Pitkin argues both that the IBLA erred in finding the Government made out a *prima facie* case that the limestone gravel piles on the Chemin 5 and Chemin 6 claims were not "uncommon varieties," and that—even if the Government did makes its *prima facie* case—the IBLA erred when applying the five-party *McClarty* test and finding the Chemin 5 and Chemin 6 gravel to be a "common variety." As I agree with Pitkin—and the ALJ—that the Government failed to establish its *prima facie* case, I do not reach Pitkin's second argument.

7

A. The Government's *prima facie* case

Pitkin argues the IBLA erred when it found the Government met its *prima facie* burden of showing the Chemin 5 and Chemin 6 limestone to be a "common variety." The determination of whether or not the Government has presented a *prima face* case is to be made solely on the evidence adduced during the Government's case-in-chief. *See United States v. Miller*, 138 IBLA 246, 270 (1997). "This includes, of course, testimony elicited in cross-examination." *United States v. Knoblock*, 101 Interior Dec. 123, 142 (1994). If the claimant undermines the Government's evidence through cross-examination of the Government's witnesses, the factfinder should take this into account when determining whether the Government meets its *prima facie* burden. *Id*. at 143.

As its case-in-chief, the Government submitted the Bureau of Land Management's ("BLM") Mining Claim Validity Examination ("MCVE") (Rec. 566), a report prepared for Pitkin by Greg Lewicki ("Lewicki report") (Rec. 788), and the testimony of BLM mineral examiners Jim Wilkinson and Roy Drew. The IBLA also considered the Government's post-hearing brief. (Rec. 1385).

The MCVE noted that much of the Leadville Limestone formation from which the Chemin 5 and Chemin 6 piles originated was *per se* locatable limestone with a calcium carbonate content of over 95%. (Rec. 576). Recent testing of the limestone in the Chemin 5 and Chemin 6 piles, however, revealed a calcium carbonate content averaging around 82%. (Rec. 577). Pitkin had sold approximately 1200 tons of limestone from the Chemin 5 and Chemin 6 piles to the Climax mine for use as an acid-neutralizing soil additive. (Rec. 578). Representatives of Climax indicated the limestone was useful for this purpose only when it

contained a calcium carbonate content at or above 85%. (Rec. 578). The price Climax paid Pitkin for the Chemin 5 and Chemin 6 limestone—based on an average calcium carbonate content of 82%—was estimated in the MCVE to be approximately $11.45 per ton. (Rec. 582).

The MCVE included a regional market analysis of limestone uses which demonstrated: (1) the prevailing rate for "rock dust" limestone—a finely-milled stone used to suppress fires in coal mines—was between $30 and $41.50 per ton; (2) the prevailing price for "stack gas scrubber" limestone—limestone used on smokestacks to reduce sulfur emissions—was $13 per ton FOB; (3) the prevailing price for cement-quality material was $5 to $7 per ton FOB; (4) the prevailing price for road base limestone was $4.50 to $4.75 per ton; and (5) the prevailing price for landscaping quality limestone was $10 per ton. (Rec. 580–81). The MCVE concluded that "the minerals required for these uses are relatively inexhaustible within the region." (Rec. 581). The IBLA interpreted this to mean the supply of limestone with a total calcium carbonate content of less that 95% was inexhaustible. (Rec. 1752).

The Lewicki report concluded that the Chemin 5 and Chemin 6 limestone possessed a calcium carbonate content of 90% to 92%. (Rec. 790). Relying on the sliding scale price Climax was willing to pay for limestone based upon its calcium carbonate content, the Lewicki report calculated the FOB price for the limestone sold to Climax in 2000 to be $13.27 per ton. (Rec. 792). This price was similar to the price paid for acid-neutralizing limestone from other sources. (Rec. 792).

At the hearing before the ALJ, the Government presented the testimony of Jim Wilkinson, the BLM geologist who prepared the MCVE. Wilkinson disagreed with the Lewicki report to the extent the Lewicki report found the calcium carbonate in the Chemin 5 and Chemin

6 piles to be 90% to 92%. (Rec. 106). Wilkinson testified that—assuming *arguendo* that Pitkin received $13.27 per ton FOB for its acid-neutralizing limestone because it had an average 91.5% calcium carbonate content and another limestone producer, Calco, received $14 per ton FOB for limestone with an 87% calcium carbonate content—Pitkin did not receive a premium for its limestone above that paid to other producers of similar limestone. (Rec. 115).

On cross-examination, Wilkinson testified that his conclusion regarding whether the Chemin 5 and Chemin 6 limestone possessed a unique and special value was based on a comparison to similar limestone throughout the region. (Rec. 997). More specifically, Wilkinson testified he determined whether the Chemin 5 and Chemin 6 limestone possessed a unique and special value by comparing it to other limestone "with about the same calcium carbonate content." (Rec. 1004). Wilkinson testified he did not compare the Chemin 5 and Chemin 6 limestone to "ordinary limestone deposits" or "common varieties." (Rec. 1011–12).

Wilkinson also testified that he failed to analyze the total carbonate content of the Chemin 5 and Chemin 6 limestone when determining whether the limestone had a unique and special value, but only examined the calcium carbonate content because that was the only factor relevant to the Climax mine. (Rec. 998–1001). The total carbonate content of the two piles was approximately 84.7% according to Wilkinson. (Rec. 1000). Wilkinson also testified that the Chemin 5 limestone—at 88.27%—had a higher total carbonate content than the Chemin 6 limestone. (Rec. 1001). At 88.27%, the price per ton FOB would be $13.75. (Rec. 1001–02). This would be $0.75 less per ton than the price for 95% calcium carbonate content limestone. (Rec. 1001–03).

The Government also presented the testimony of Roy Drew, the BLM mineral examiner who reviewed Wilkinson's mineral report. Drew testified that Leadville Limestone was widespread throughout the region. (Rec. 1080). Drew further testified that, because the Chemin 5 and Chemin 6 limestone was less that 95% calcium carbonate, there was nothing unique about it. (Rec. 1080). Drew testified there were millions of tons of limestone in Colorado that contained less that 95% calcium carbonate, as well as millions of tons of limestone with 91% calcium carbonate or more. (Rec. 1080, 1082). Drew compared the Chemin 5 and Chemin 6 limestone to "other similar limestones in the region and in Colorado" and determined that a "large, large percentage" of such limestone would possess a similar carbonate profile. (Rec. 1083). Drew testified there was a wasterock pile of approximately 300,000 tons of 92% calcium carbonate near the Sherman Mine in Leadville, Colorado. (Rec. 1086).

On cross-examination, Drew testified that none of the Sherman Mine wasterock had been sold for acid-neutralization purposes. (Rec. 1099). Drew testified that his opinion on whether the Chemin 5 and Chemin 6 limestone was locatable was not affected by the existence of the Sherman Mine limestone. (Rec. 1100). Drew also restated, while being examined by the ALJ, his understanding that the *McClarty* test required "the rock in question be compared to other similar rock in the region." (Rec. 1123–24).

In its post-hearing brief, the Government noted that Leadville Limestone is common throughout Colorado. (Rec. 1399). Limestone with a calcium carbonate content of 88.2% or better is "relatively inexhaustible within the region." (Rec. 1399–1400). The price paid to Pitkin for its limestone averaged $12.88 per ton, while the price paid for limestone for acid-neutralization purposes from other sources was between $14 and $26 per ton. (Rec. 1405).

11

## B. IBLA analysis

The IBLA did not apply the three-part test articulated in *Multiple Use* and its progeny. Instead, the IBLA examined "the Government's proof to determine whether it met the burden articulated in [*United States v.*] *LeFaivre*." (Record 1751). Although *LeFaivre*, 138 IBLA 60 (1997), explicitly applied the *Multiple Use* test, the IBLA restated the test in only its most general terms: "In the common varieties context, the Government need only show that the mineral deposit does not possess a unique property giving it a distinct and special value to meet its burden." (Rec. 1750–51).

While the test articulated by the IBLA may be an adequate shorthand for the test articulated in *Multiple Use* and applied in *LeFaivre*, the IBLA's application of that test failed to take into account the second and third prongs of the test—whether the material's price is similar to that paid for such material typically put to "common variety" use and whether the material would command a price higher than the price paid for the "common variety." *See United States v. Multiple Use, Inc.*, 120 IBLA 63, 65 (1991). The only "common variety" uses identified by the IBLA were concrete aggregate, for which the price paid was $5 to $7 per ton, and road base, for which the price paid was $3 to $6 per ton. (Rec. 1754–55).

While it would appear obvious that the price paid to Pitkin for limestone used as an acid-neutralizing agent—for which the price paid was somewhere in the vicinity of $12 to $13 per ton—is not similar to that paid for these "common variety" uses, the IBLA never made such an inquiry. Instead, the IBLA compared the price paid for the Chemin 5 and Chemin 6 limestone to that paid for other limestone used as an acid-neutralizer, and concluded Pitkin's price to be lower than the price paid to other producers. (Rec. 1752–56). Thus, the IBLA concluded Pitkin was

not being paid a premium for the Chemin 5 and Chemin 6 limestone over the price paid to other producers for acid-neutralizing limestone. (Rec. 1756).

As the IBLA noted, however, whether use of limestone as an acid-neutralizing agent in reclaimed mining soils was a "common use" was a question of first impression. (Rec. 1757). By the IBLA's own reasoning, comparing the price paid to Pitkin for limestone used as an acid-neutralizing agent in reclaimed mine soils to the price paid to other producers for limestone put to a similar use was clear error. The IBLA could not have determined whether the value of the Chemin 5 and Chemin 6 limestone was similar to the value of limestone when put to a "common" use by comparing the Chemin 5 and Chemin 6 limestone to other limestone used for acid-neutralization in reclaimed mine soils—an application whose commonality was the very legal issue the IBLA was supposed to decide in the first instance. *See United States v. Kaycee Bentonite Corp.*, 64 IBLA 183, 208 (1982) ("One example demonstrates the obvious fallacy of extending this argument too far: gemstones would become common varieties of stone if comparison were limited only to other gemstones."). The IBLA should have compared the value of the Chemin 5 and Chemin 6 limestone when used for acid-neutralization in reclaimed mine soils to the value of limestone put to "use as a building material which has typified common variety minerals." *See id*. at 209 (citing *United States v. Bolinder*, 28 IBLA 187 (1976)).

A review of the record puts the value of the Chemin 5 and Chemin 6 limestone—when sold as an acid-neutralizing agent in reclaimed mine soils—as low as $11.25 per ton (Rec. 582) and as high as $13.75 per ton (Rec. 1001). The price paid for "common variety limestone" was as low as $3.50 and as high as $10 per ton. (Rec. 580–81, 1275). Although it would ultimately have been a decision within the expertise of the Department of the Interior—thereby requiring a

13

high degree of deference from this Court—whether the value of limestone used as an acid-neutralizing agent in reclaimed mine soils was "similar" to the value of "common varieties" of limestone for purposes of establishing the Government's *prima facie* case, such a determination was never made by the IBLA in the proceedings below. The IBLA simply determined "that the price of sales to Climax was a few dollars higher than most sales of limestone conceded by all to be a common variety," but made no findings on whether the "few dollars higher" was sufficient to show the price paid for the Chemin 5 and Chemin 6 limestone was "similar." (Rec. 1776).

It cannot be doubted that the Government bore the burden of showing the price paid for the Chemin 5 and Chemin 6 limestone was "similar" to that paid for "common varieties." As noted by the ALJ—and not contradicted by the IBLA—the Government did not attempt to make such a comparison during its case-in-chief. (Rec. 1509–13). Even under the IBLA's proposed abbreviated standard regarding the Government's *prima facie* burden—"the Government need only show that the mineral deposit does not possess a unique property giving it a distinct and special value" (Rec. 1750–51)—no comparison was made sufficient to show whether the Chemin 5 and Chemin 6 limestone was "distinct and special." The IBLA addressed the question only minimally, stating: "All of this evidence shows, at best, that the price of sales to Climax was . . . similar to or vastly less than sales of limestone conceded by all to be uncommon variety." (Rec. 1776). The IBLA concluded that the evidence was "not sufficient to preponderate on the question of whether the deposit in the stockpiles has a unique property, or a distinct and special value." (Rec. 1776). In short, the IBLA failed to properly apply the standard it itself articulated.

While the lack of conclusive evidence of value may have been sufficient to support a

14

finding against Pitkin after the burden of persuasion had shifted, the burden does not shift unless the Government shows "that the mineral deposit does not possess a unique property giving it a distinct and special value." The Government never made such a showing. Accordingly, I find and conclude the IBLA's decision was arbitrary and capricious, and not in accordance with law or supported by substantial evidence, and should be reversed.

## V. CONCLUSION

When the IBLA acts beyond the scope of its authority by failing to consider relevant factors and applicable legal standards, or by reaching a conclusion based upon a clear error of judgment, I may not affirm. *See Olenhouse*, *supra*, 42 F.3d at 1575. Because the arbitrary and capricious standard focuses on the rationality of the IBLA's decisionmaking *process*, rather than the rationality of the decision, the "action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n*, *supra*, 463 U.S. at 50. I may not make up for deficiencies in an agency record by supplying a reasoned basis for the agency's action. *See Olenhouse*, 42 F.3d at 1574–75 (citing *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43). If the administrative record does not contain evidence supporting the IBLA's conclusion, I may supplement the record or remand the case to the agency for further proceedings. *See id.* at 1575. Having reviewed the administrative record in this case, I agree with the ALJ that the Government failed to meet its *prima facie* burden and dismissal was the appropriate remedy. *See id.* at 1580; *United States v. Taylor*, 19 IBLA 9, 23 (1975).

Accordingly, IT IS ORDERED that the November 29, 2006, decision of the Interior Board of Land Appeals in matter IBLA 2004-261 is REVERSED and the case REMANDED to the Office of Hearings and Appeals with instructions to REINSTATE the May 3, 2004, ruling in this case.

Dated: May   9  , 2008.

                                  BY THE COURT:

                                     s/Lewis T. Babcock
                                  Lewis T. Babcock, Judge